IN THE COUNTY COURT OF THE FIRST JUDICIAL DISTRICT

OF HINDS COUNTY, MISSISSIPPI

PLAINTIFF'S
EXHIBIT

**F**
_____

STATE OF MISSISSIPPI

VERSUS                                         NO.   23-1511

JAMISON KELLY                                          DEFENDANT


* * * * * * * * * * * * * * * * * * * * * * * *

TRANSCRIPT OF THE PROCEEDINGS IN THE ABOVE-STYLED AND

NUMBERED CAUSE BEFORE THE HON. JAMES BELL, HINDS

COUNTY JUDGE, ON THE 13TH DAY OF NOVEMBER 2023.

* * * * * * * * * * * * * * * * * * * * * * * * *


APPEARANCES:

        **Representing the State:**
          **GWEN AGHO, ESQ.**
          Assistant District Attorney


        **Representing the Defendant:**
          **JERRY CAMPBELL, ESQ.**
          Attorney at Law


Reported By:    Pearlie Westmoreland
               Official Court Reporter
               Post Office Box 327
               Jackson, Mississippi 39205

# TABLE OF CONTENTS

**PAGE**

Style and Appearance............................ 1

Table of Contents.............................. 2

**LIEUTENANT TERRANCE JACKSON**

   Direct Examination by Ms. Agho................. 3

   Cross Examination by Mr. Campbell.............. 13

   Redirect Examination by Ms. Agho.............. 22

Legal argument................................ 25

Ruling of the Court........................... 38

Hearing Concluded............................. 41

Certificate of Court Reporter................. 42

**EXHIBITS**

1 - Elisha Brown's statement

A - ID - Statement

**THE COURT:**  State of Mississippi versus Jamison Kelly, preliminary hearing. I will hear the evidence the State has to offer.

**MS. AGHO:**  At this time the State will call Lieutenant Terrance Jackson.

**LIEUTENANT TERRANCE JACKSON, called as a witness on behalf of the State, having first been duly sworn, was examined and testified as follows, to-wit:**

**DIRECT EXAMINATION BY MS. AGHO:**

Q.  Lieutenant, please introduce yourself to the Court.

A.  Lieutenant Terrance Jackson, employed with the Jackson State Department of Public Safety's investigative unit.

Q.  How long have you been an investigator for law enforcement?

A.  Approximately now going on 11-and-a-half years; 9-and-a-half in investigations, robbery/homicide with the Jackson Police Department. I started with Jackson State in September.

Q.  I want us to go just straight ahead.  What day was Jaylen Burns killed?

A.    On October 15th.

Q.    If you could tell me, was there anything else going on at JSU campus at that time?

A.    It was closing out homecoming weekend.

Q.    I want to kind of start from the beginning and tell who are the players.  What led to the murder of Jaylen Burns?

A.    As our investigation showed, it started out earlier that day with a dispute between two other students, a Ms. Elisha Brown and a Jordan McCollins, which led to Ms. Brown calling Mr. Kelly, and advising us that she called Mr. Kelly to come to the campus because she felt threatened.

Q.    How did Ms. Brown and Mr. Kelly know each other?

A.    She stated he was her best friend, and they are from the same hometown and grew up together.

Q.    What hometown is that?

A.    Columbia, Mississippi.

Q.    How were you able to confirm that they were best friends and grew up together?

A.    Basically through her interactions and her interview.  She stated it herself, and multiple other witnesses stated that that was her best friend.

Q.    You said that she called him to come to

campus.  If you could tell me, how do you know he came to the campus?

A.   Well, basically after I guess the incident that day, as our investigation continued, we later learned through our tag readers and other eyewitnesses.

Q.   Where are the tag readers located?

A.   That is kind of undisclosed, but it's on campus.

Q.   Would this be on JSU's campus?

A.   Yes, ma'am.

Q.   So you said through tag readers.  What information were you able to get on the tag readers?

A.   Through our tag readers and also our video surveillance showed Ms. Brown, who drives a white Mustang -- I think the tag on it reads NPE or something.  It showed that she proceeded to the front gate, and then it showed her coming back and being followed by a blue Acura with tag Mike Mike Charlie, I think 4821, following her onto campus and to the University Pointe Apartments.

Q.   And so who were you able to confirm that that tag -- I think you said it was MMC 421?

A.   I think it is 4821.

Q.   Who was that car registered to?

A.   It was registered to a Jamison Kelly, Senior, but we later learned that it was operated and driven by Jamison Kelly, Junior.

Q.   How did you know that that car was being led by Elisha Brown?

A.   Through our video surveillance.  And then once the vehicle parked at University Pointe, you could see individuals getting out, and Ms. Brown going over and making contact and hugging the individual, and then they walk into her apartment.

Q.   Did Ms. Brown later confirm that Jamison Kelly was the person she hugged?

A.   Yes, she did.

Q.   Where was her apartment located?

A.   It was located at 1400 J.R. Lynch, but it's inside the University Pointe Apartments.  It would be Building 900, but the suite is 1000.

Q.   I believe I want you to sort of repeat why was Jamison Kelly, according to Ms. Brown, called to the campus?

A.   Ms. Brown stated earlier that day she and her then boyfriend Jordan had gone to a birthday brunch.  They came back to the campus.  They had an altercation where they were going back and forth with one another.  Ms. Brown alleged that Jordan had been

drinking.  At that point they had a disagreement, a dispute, and at that point they were trying to exchange each other's belongings.

Q.   So they had broken up?

A.   Yes.

Q.   You said that was in the morning.  About what time was Jamison Kelly driving on campus being led by Ms. Brown?

A.   I think it was approximately around 8:50 I think you could see the vehicles coming onto campus.

Q.   And what apartment did they go back to?

A.   Ms. Brown's, which would be Building 900, Suite 104.

Q.   Tell us what happened or what your investigation revealed happened at the apartment?

A.   Once they got there, once Mr. Kelly arrived, Ms. Brown stated that she, Mr. Kelly, and several others went down to Jordan's room.  They went down to Jordan's room to confront Jordan and to retrieve her other items.

Q.   Before you go further, did Mr. Kelly, when he drove onto campus, did he drive alone?  Was he in the car alone?

A.   No, he had approximately three to four other individuals in the vehicle with him.

Q.    Were those the people who went with Elisha to Jordan's room?

A.    No, she only stated that the other individuals stayed at her suite.  And Mr. Kelly, I think Mr. Thompson, and she named two or three females, they all went down to Jordan's room then.

Q.    What happened next?

A.    She said when they got there, they confronted Jordan about her belongings.  Jordan told her that her stuff was outside.  At that time she saw Mr. Jordan with another young lady.  From what we could tell, there was an incident in the lobby of that suite where a table was broken, and then Ms. Brown, Mr. Kelly, and the others retreated back to her apartment.

Q.    Who was involved in the breaking of the table?

A.    We are not sure yet.

Q.    So what happened next?

A.    Then at that time Jordan notified his fraternity brothers and line brothers.  He still had items at Ms. Brown's apartment.  It was at that time several individuals along with the victim went down to Ms. Brown's apartment to retrieve his items. There was a verbal altercation.  Then it turned into

a physical altercation, and then led to gunfire where Mr. Burns was shot.

Q.   I want to go into that.  The individuals, the line brothers of Jordan, they went over to Ms. Brown's apartment?

A.   They did.

Q.   With the purpose of -- what was your understanding of the purpose?

A.   To retrieve his items, and some of them went to console her.

Q.   And so after they got to that apartment, you said there was an altercation?

A.   First it started as a verbal altercation. Ms. Brown stated and other witnesses stated that at least two or three of the guys came inside.  As they were talking to Ms. Brown trying to console her, and she going back and forth with them telling them that she knew they were going to stand up for him with whatever he's doing and his wrongdoings, it was at that time a verbal altercation pursued between her and one of her friends that she had in the apartment with her.

It was at that time they started exchanging words.  Those three individuals began to fight with the individual on the inside, and it spilled into the

outside.

Q.   So who was fighting?  I know we have the group of Jordan's friends, and we have Jamison Kelly and his friends.  Who all were fighting?

A.   At that point all of them were fighting it was stated.  It was some of the Alphas, at least three on the inside, that were already on the inside speaking with Ms. Brown.  Then you had the individuals along with Mr. Kelly and this other individual inside the apartment fighting.

Q.   Did anyone see a firearm at that time?

A.   They did.  One of the witnesses described that an individual that was inside the apartment with Mr. Kelly then grabbed his firearm from the counter.

Q.   And the person who grabbed the firearm, did they identify that as Mr. Kelly?

A.   No.  No, they did not.

Q.   But was that person with Mr. Kelly?

A.   Yes, he was.

Q.   And if you could, you said the fighting spilled out into the street or to the outside.  The outside of the apartment?

A.   Yes, ma'am.  The way this is made is you have a breezeway, and then you have the front door. When you go into the apartment, you have a little

Lt. Terrance Jackson - Direct

small area, and then you have a breezeway outside which are steps leading up to the apartment.  It was at that time that as they got to fighting outside, someone yelled, "Gun."  At this time all of the young men that were outside fighting, the Alpha's ran to the right side of the building, going around to the right side.  Mr. Burns went to the left, leaving him as the single target.

Q.   So just to be clear, you said all the young men were fighting the Alpha's, or the Alpha's ran to the right side?

A.   The Alpha's ran to the right side.

Q.   And the Alpha's would be the line brothers of Jordan?

A.   No, Jaylen.  I mean Jordan and Jaylen.

Q.   Jordan and Jaylen?

A.   Yes, ma'am.

Q.   And then Jaylen Burns ran to the --

A.   -- To the left side.

Q.   -- to the left side.  And so he was the only one running in that direction?

A.   Yes.

Q.   How many shots were you all able to determine were fired?

A.   From what we could tell, it appeared to be

two, between two and three.  We are not sure exactly, but you see at least two.  The witnesses identified two shots.

Q.   What is your understanding based on your investigation of where Jamison Kelly was at this time?

A.   From what we can tell, he was still either right there close to the doorway, because Ms. Brown stated after the fights and everything and the shots, she approached him and asked him was he shot.

Q.   Was he shot?

A.   No, he wasn't.

Q.   Where did Jamison Kelly go from there?

A.   He and the other individuals got into his vehicle, and then they left the campus.

Q.   Where did your investigation -- how did your investigation reveal that the shooter left the campus?

A.   Because they saw the shooter was with Mr. Jamison, and the witnesses all stated that they left in a blue vehicle, which was later determined that the blue vehicle was the Acura.

Q.   And that's the one with the license plate registered to Jamison Kelly, Senior?

A.   Yes.

Q.   How many people were able to confirm that Jamison Kelly was present on the night of the 15th at the JSU apartment complex?

A.   We show approximately -- we showed a six-man lineup to approximately seven to eight that identified him, and then also Ms. Brown herself identified him.

Q.   Were you ever able to arrest Jamison Kelly?

A.   We did.  We traveled to Columbia where he had surrendered to the Columbia Police Department.

Q.   Were you ever able to interview him?

A.   No.  We Mirandized him and asked if he would like to give a statement, and he refused.

Q.   What did you ultimately charge him with?

A.   Accessory after the fact to murder.

Q.   Why did you charge him with that?

A.   Because of having knowledge and the suspect was driven away by Mr. Kelly.

        **MS. AGHO:**  I tender the witness, Your Honor.


**CROSS EXAMINATION BY MR. CAMPBELL:**

Q.   Officer, why was there an initial arrest of a defendant that has been subsequently -- the charges were dismissed?

MS. AGHO:  Objection, Your Honor.

That is unrelated to why we are here today.

THE COURT:  Overruled.

Q.  (By Mr. Campbell)  Who was initially picked up for doing the shooting?

A.  Pardon me?

Q.  Who was the individual arrested for doing the shooting?

A.  Joshua Brown.

Q.  Okay, Joshua Brown was picked up.  What happened to that charge?

A.  Well, that charge was N/A'd.

Q.  Sir?

A.  It was N/A'd.

Q.  Was it not dropped because he wasn't there?

A.  Well, that investigation is still ongoing. It is no longer in our department.

Q.  In fact, he was on videotape not even at the apartment; is that correct?

MS. AGHO:  Objection, Your Honor.

THE COURT:  Sustained.

MR. CAMPBELL:  If I could address it, it goes to the credibility of their information that they are getting.  An individual was arrested that wasn't even

there.

THE COURT:  Yes, but getting into the details of the case concerning Joshua Brown would be inappropriate.  However, I understand your point that Jamison Kelly is charged with accessory after the fact to murder and initially driving Joshua Brown away from the incident in which the charge was that Joshua Brown was the murderer. And now the charge against Joshua Brown is dropped.  That's your point.  That does not mean that there was not another shooter that was driven away is the State's point.

So getting into the details about why the case was dismissed against Joshua Brown is less significant than who the shooter was that he drove away.

So I'm sustaining the objection about getting into the details of Joshua Brown. But if you want to get into the details about somebody else who was present, I would like to hear it.

MR. CAMPBELL:  Yes, sir, I would.

Q.   (By Mr. Campbell)  There were three individuals with Jamison Kelly.  Did you determine

that?

A.   Yes, sir.

Q.   Have you interviewed them?

A.   No, I have not.

Q.   You have not even talked to them?

A.   I have spoken to one of them.

Q.   Has anybody made any -- do y'all have any idea who the shooter is?

A.   Like I say, that case has now been turned over to Mississippi Bureau of Investigation, so they will be handling that part of it.

Q.   I couldn't understand you.  You said what?

A.   That part of the investigation has been turned over to the Mississippi Bureau of Investigation.  They will be handling that part of that.

Q.   So it's an ongoing investigation?

A.   Yes, it is.

Q.   Why is he arrested as an accessory after the fact when you haven't even determined who the shooter was?

A.   We do have evidence of Mr. Kelly being on campus.  Mr. Kelly was identified by several individuals, his vehicle.  We have video surveillance of Mr. Kelly on campus, and the shooter came with

Mr. Kelly, and the shooter left with Mr. Kelly.  And that is why he was charged with accessory after the fact.

Q.  That part is losing me.  What do you mean *the shooter*?  Who left with Mr. Kelly that you can say was the shooter?

A.  The individuals that came -- the possible shooter was with Mr. Kelly.  He was identified as being in the apartment with Mr. Kelly.  The witnesses identified him picking up the gun, and the witnesses identified him leaving with Mr. Kelly.

Q.  But there has been no charge lodged against an individual in the car with Mr. Kelly at this point?

A.  Like I said, it's an ongoing investigation. From our investigation right now, the shooter came with Mr. Kelly.  The shooter is seen leaving with Mr. Kelly.  That shooter has not been identified. It's still an ongoing investigation.

Q.  Okay, still an ongoing investigation.  Is it possible there was another shooter?  I mean, not another, but that somebody else could have fired the shot besides one of the three that got in his car? Is that possible?

A.  The thing is now we are not charging

Mr. Kelly with murder.  Mr. Kelly is being charged with accessory after the fact, which the shooter left with Mr. Kelly.  Mr. Kelly had knowledge of it. Mr. Kelly transported him away and helped him to evade arrest.  That is why Mr. Kelly is being charged with accessory after the fact, not the murder.

Q.   Would you disagree he has been charged to put him in a position where he needs to talk?  Is that what you are saying?

A.   No.  He has the right to invoke his Fifth Amendment right and not speak to us.  But at the same time, if he or you as his attorney choose for him to speak, that is between you and the State.  Like I said, it is an ongoing investigation.

Q.   Do you not, sir, think it's premature to charge him at this point with accessory after the fact when you haven't even identified who the shooter was?

A.   No, sir, we don't.  The fact is there was a shooter.  The fact is we have a young man dead, and that shooter was taken away by Mr. Kelly and brought by Mr. Kelly.  So that is not premature.  That is the evidence that we have.  It's on video, and his own best friend's statement and other witnesses put him here.

Q.    I'm not going to beat the point up.  If the shooter was carried away by Mr. Kelly, why haven't there been an arrest for the shooter?

A.    Like I said, it's an ongoing investigation. That part is being handled by the Mississippi Bureau of Investigation.

Q.    How many other people from that fraternity were at that altercation?  Wasn't it a large number?

A.    It varies, because at one time we were told it was 20.  At one time it was said 14, and now it's said seven.  So the numbers have been different throughout the whole investigation.  That is why it is an ongoing investigation, and it is still being investigated to find out who all were there.

Q.    14 to 20, is that correct?

A.    No.  Like I said, at first we were told it was 20-something, and then it was told as 14.  As the investigation continued, the numbers dwindled down, and sometimes the number went up, depending on who was giving the information.  That is why it is still an ongoing investigation that's being investigated by the Mississippi Bureau of Investigation, and they will have to determine how many people were there.

Q.    How many were in the group with Mr. Kelly?

A.    Pardon me?

Q.    How many were with Jamison Kelly?  How many individuals?

A.    Possibly three.

Q.    Three.  And 14 to 20 showed up at the apartment complex; is that correct?

A.    No.  Like I said, the numbers have changed every time we interview someone.  But the numbers that we pretty much investigated, you had about six or seven individuals that went down to Ms. Brown's apartment.  And then looking at the numbers, you had at least six going to Mr. Jordan's apartment with Mr. Kelly.  That's why I said -- so the number -- that's why it is still an ongoing investigation to determine the actual people involved.

Q.    And it's absolutely no thought that Jamison Kelly fired a gun?

A.    Correct.

Q.    Is that correct?

A.    Correct.

Q.    So what he is at this point charged with is he got in his car, and three people got in the car and left with him, is that correct, and y'all suspect one of them was the shooter?

A.    Correct.

Q.    You suspect one of them was the shooter?

A.   Well, it is not suspected, sir.  Witnesses identified and said that the shooter, the young man that came with Mr. Jamison that was inside the apartment that grabbed the gun and that fired the shot left with Mr. Kelly.  So that was from witnesses.

Q.   Why has that person not been arrested?

A.   What person?

Q.   The one that the witness said fired the gun?

A.   I guess when you all cooperate with the Mississippi Bureau of Investigation you all will get that information.  But like I said, at this time it is still an ongoing investigation to find out who the actual shooter was.  But we know who the actual driver was.

Q.   Who identified Joshua Brown as the shooter?

MS. AGHO:  Objection, Your Honor.

MR. CAMPBELL:  I will take that away, Judge.

Q.   (By Mr. Campbell)  Was he initially identified as the shooter?

A.   Yes, he was.

Q.   And that turned out to be totally not credible?

A.   I wouldn't say totally not credible.  Eye witnesses identified him.

Q.   But he wasn't there?

MS. AGHO:  Objection, Your Honor.

THE COURT:  Sustained.

Q.   (By Mr. Campbell)  Were there any surveillance cameras at all that shows anything?

A.   Yes, it was.

Q.   But it doesn't show who the shooter was?

A.   No.

Q.   It does not show who the shooter was; is that correct?

A.   Correct.

MR. CAMPBELL:  Your Honor, at this point we are through asking him questions.

THE COURT:  Redirect?

**REDIRECT EXAMINATION BY MS. AGHO:**

Q.   Lieutenant Jackson, you stated that this is an ongoing investigation, correct?

A.   Yes, ma'am.

Q.   Initially you all received information that Joshua Brown was the shooter, correct?

A.   Yes, ma'am, we did.

Q.   And you all are still investigating that;

would that be correct?

A.    Yes.

Q.    With the Mississippi Bureau of Investigation?

A.    Yes, ma'am.

Q.    But one thing that you do know is that a witness saw someone pick up -- saw a male pick up a firearm in Elisha's apartment; would that be correct?

A.    Yes, ma'am.  Inside the suite area, yes.

Q.    And that would have been a person brought there by Jamison Kelly, correct?

A.    Yes, ma'am.

Q.    And other witnesses saw the shooter and everyone leave with Jamison Kelly, correct?

A.    Correct.

Q.    You all are still trying to determine who exactly that person is, correct?

A.    Yes, ma'am.

Q.    And you are currently conducting multiple interviews with all the people that have been identified as being present at the suite at that time; would that be correct?

A.    Correct.

Q.    I have just a brief mention about surveillance.  Was there any part of the shooting

caught on camera?

A.   The only part that you can see on our surveillance is what we call a ricochet or a kick-up as the bullet is -- the dust flying up from when the bullet hit the ground.  And then also you can see Mr. Burns being shot.

MS. AGHO:  No further questions, Your Honor.

THE COURT:  You can step down.

MR. CAMPBELL:  Could I ask one question?  I apologize.

THE COURT:  We don't have recross.

MR. CAMPBELL:  Okay, that's fine.

(WITNESS EXCUSED)

THE COURT:  Your next witness?

MS. AGHO:  No further witnesses, Your Honor.

MR. CAMPBELL:  Judge, this is a preliminary hearing.  I would like to offer some proof of some statements, if permitted, that Rule 6.2 allows me to offer into evidence.

THE COURT:  Okay.

MR. CAMPBELL:  Is that okay with the Court?

**THE COURT:**  It is.

**MR. CAMPBELL:**  Okay.

**THE COURT:**  Before doing so, Rule 6 requires the Court to make a ruling on whether there is probable cause to continue the case before you have to put on evidence.

The stated testimony is that witnesses identified three individuals arriving at the scene with Mr. Kelly.  That witnesses said one of those individuals picked up a gun and used the gun in the killing of Mr. Burns.  And that witnesses said that the individual who shot, left the scene with Mr. Kelly.  And the charge is an accessory after the fact of murder.

At trial the State would have the burden of proving beyond a reasonable doubt that Mr. Kelly knew that he was aiding and abetting a murderer in the escape or avoidance of prosecution by driving him away from the scene.

The burden of proof at a preliminary hearing is not beyond a reasonable doubt. It is probable cause, is there probable

cause to believe that a crime may have been committed by Mr. Kelly.

And this stage the evidence is barely touching the probable cause issues.  So I will allow the case to proceed.  If you have evidence to offer, I will hear it.

**MR. CAMPBELL:**  Judge, I have a statement that we expected -- the rule permits us to read the statements.

**THE COURT:**  You will need to show it to counsel, and I will see whether there is any objection to it.  Is there any objection to the statements?

**MS. AGHO:**  I would object to the statement that is purported to be by Jamareous Thompson.  One of the statements I have seen before, the Elisha Brown statement, so I know that she made that statement.  I understand the rule on hearsay in preliminary hearings, but that is not signed by him.  It doesn't indicate even that Jamareous Thompson is who is talking.  It's just a typed up document. There is not anything on here to know where it came from.

**THE COURT:** What is the indicia of reliability that I could rely upon for receiving this?

**MR. CAMPBELL:** Judge, it's under Rule 6.2(a). The defendant may make a specific offer of proof, including the names of witnesses who would testify or the defendant may produce the evidence offered. So it's a preliminary hearing. Can I continue?

**THE COURT:** You may.

**MR. CAMPBELL:** Hearsay evidence is admissible. These were statements that were given to the investigator, and we synopsized what they said. This would be proof we would introduce at trial, and the rule allows this type of evidence.

**THE COURT:** But it provides that -- at this hearing hearsay in whole or in part is admissible provided there is a basis for believing the source of the hearsay to be credible and for believing that there is a factual basis for the information furnished. The statement being challenged is that -- well, I'm trying to find the

name.

MS. AGHO:  That's my point, Your Honor.  I didn't see a name.  I had to ask him who actually wrote that statement.  The other statement I have seen before, so I know that that is Elisha Brown's statement.  The statement purported to be from Jamareous Thompson I've never seen, although I would say that in the statement, whoever wrote it didn't see anything.  They say that.

THE COURT:  Sort that out for me.  Let's mark the one that you don't object to.  Which one is the one that you do not object to?  That will be marked into evidence, the one that's not objected to.

(EXHIBIT 1)

THE COURT:  The second document will be marked for identification.

(EXHIBIT A FOR IDENTIFICATION)

THE COURT:  Let me see those.  I'm going to review Exhibit 1 first.

Exhibit A for Identification, tell me what is the basis for believing the source of this hearsay to be credible for the

purposes of preliminary hearing?

MR. CAMPBELL:  Sir?

THE COURT:  The statement that's been marked for identification, in order to be admissible there has to be a basis for believing the source of the hearsay to be credible and for believing that there is a factual basis for the information furnished.  So tell me what that is.

MR. CAMPBELL:  Your Honor, those statements were given to the investigator, and then they synopsized what they told the investigator.  They were obtained by the attorney for Joshua Brown when he met with them, met with the DA's office, and he gave me those statements as a synopsis of what they would say.  And it was correct.  That's it.

THE COURT:  This was a synopsis prepared by counsel for Mr. Brown --

MR. CAMPBELL:  Correct.

THE COURT:  -- of statements given by witnesses?

MR. CAMPBELL:  Yes, sir.

THE COURT:  Given by witnesses to the

police?

MR. CAMPBELL:  Yes, sir.

THE COURT:  So this is not a synopsis that you prepared from those statements, and this is not --

MR. CAMPBELL:  No, I did not.

THE COURT:  And these are not the statements themselves?

MR. CAMPBELL:  Sir?

THE COURT:  These are not the statements themselves.  This is the summary prepared by somebody else?

MR. CAMPBELL:  Right.  Correct.  Given to the investigator.

THE COURT:  I will sustain that objection.

MR. CAMPBELL:  Your Honor, we have three witnesses that will be called, not at the preliminary hearing.  But the rule provides that the defendant may then make a specific offer of proof, including the names of witnesses who would testify, and I could give the Court these three witnesses.

THE COURT:  Do you have any of those witnesses here to testify?

**MR. CAMPBELL:**  No, I do not.

**THE COURT:**  I will hear what you have to say.

**MR. CAMPBELL:**  Their names are Ziquae Amos, Teshonne Franklin, and Marquis Scales.  What we would expect them to testify, which hearsay is admissible just as the officer, is that they left in the vehicle with Jamison Kelly after these shots were fired and that nobody in that group fired the shot.  All four of them immediately left.  That's what they were expecting to testify.

**THE COURT:**  What is the basis of that information that you're giving me?

**MR. CAMPBELL:**  I personally talked to each one of them and asked them specifically, and they said, "We did not fire the shots," and they left when they heard the shots fired.

**THE COURT:**  That's different from a summary received from somebody else.

**MR. CAMPBELL:**  Yes, sir.

**THE COURT:**  Anything else?

**MR. CAMPBELL:**  And Mr. Kelly has the

right not to testify, and he's not going to testify at the preliminary hearing.  But at the trial I would expect him to say he had no idea of anybody in that group firing a shot and specifically asked them did anybody fire the shot, and the response was no.  And that is what he would testify to.

Now, if I could, Your Honor, if the Court determines that it is some probable cause, I would like to go into the bond hearing too today.  And I have got the information about the bond hearing.

**THE COURT:**  I will come to that shortly.  Do you have anything else to offer on the probable cause issue?

**MR. CAMPBELL:**  No.

**THE COURT:**  Any response to the statements of counsel concerning probable cause?

**MS. AGHO:**  Yes, Your Honor.  As Your Honor correctly stated before, the standard being probable cause for a preliminary hearing.  Lieutenant Jackson did testify how they identified Jamison Kelly as being on campus.  I don't believe that is

disputed even by some of the statements in here.

That specifically there was fighting going on between a number of Alpha's and four people that came with -- either four altogether, three or four people that were with Mr. Kelly.

That when someone yelled out, "Gun," all the Alpha's ran one way, and Jaylen Burns ran the other way, making him a single target, and that he was hit by a firearm at that time when all of the other Alpha's ran in a different direction.  And then the person who shot got into a car with Jamison Kelly, and he left.

Further, there was testimony by Lieutenant Jackson that in the apartment, one of the men that came with Jamison Kelly was seen picking up a firearm.

Your Honor, I believe that would be enough for probable cause.  Even in the statement that was admissible, I think it was the statement of Elisha that wasn't objected to, she said they heard the gunshots, and there was fighting going on

around them.  So they knew that there had been a shooting.

I understand that opposite counsel has stated that Ziquae Amos, Teshonne Franklin, and Marquis Scales would say that they were not the shooter, but up until today I had never even heard the names Ziquae Amos and Teshonne Franklin.

As Detective Jackson stated, they have been trying to identify these people.  Of course, these are the people that came with Mr. Kelly.  These are not people that we can identify from the Alpha's.  They did not come with the Alpha's who goes to school at JSU.  Up until recently Elisha Brown has stated that she did not even know who these people were.

Again, the investigation is ongoing. I would say that there is a probable cause that the defendant was the person who brought the shooter and drove the shooter away from the scene, and that the simple statements of opposing counsel that Ziquae Amos, Teshonne Franklin, and Marquis Scales say they didn't shoot a gun does not

overcome the probable cause of the State.

MR. CAMPBELL:  Judge, what concerns me is they keep saying an ongoing investigation.  I know why -- you make arrests in my -- and this is argument.  You make arrests to force people to talk.

They had the wrong person to start with.  Joshua Brown was arrested and charged with murder.  The relevance of that is how credible is anybody saying who did it when he was arrested and shown to be not even there.  So the credibility of those people as far as a probable cause hearing is zero to be saying that.  It's probable cause.

If they have an ongoing investigation, he can be subsequently indicted by a grand jury, but he shouldn't be held until they finish the investigation.  That's all.  He should not be held until they finish the investigation.

It doesn't even say he knowingly transported somebody away.  Until the investigation goes forward, there's not even the saying you have to knowingly

transport them away knowing they just committed a crime.  That's all.  So nothing to be assessed from the investigation going on.

If it is shown to be him, which I'm sure it is not going to be, then he can be indicted, but to hold him at this pint is not right.  It does not meet the burden that says it has to be substantial proof.  That's all we are asking.  It doesn't mean the charges are dismissed.

If you have an ongoing investigation, don't be arresting people until you get some concrete proof more than what they have now.

**THE COURT:**  Alright, thank you, Mr. Campbell.

Since the State has the burden of proof, you get to have the last say.  Since he's made what he says is his closing statement, you may make any closing statement you choose.

**MS. AGHO:**  Your Honor, in bringing up the Joshua Brown arrest, we talk about the ongoing investigation as to determining who

finally was the shooter. The investigation could lead us to that Jamison Kelly was the shooter. It could confirm that it wasn't Joshua Brown or was Joshua Brown.

We are still in the process of that, but one major difference between Jamison Kelly and Joshua Brown is that eyewitnesses place Joshua Brown at the scene. Jamison Kelly is placed at the scene by his best friend, Elisha Brown, by the statement they even produced in court. He was definitely at the scene. To say that he wasn't even there, Joshua Brown wasn't even there and that was a lack of credibility, as Lieutenant Jackson testified, multiple witnesses, seven witnesses or so identified Jamison Kelly at the scene.

The statement that the defense produced said that he was there when the shooting took place, in both statements, even the one that cannot be verified.

Your Honor, we are here for probable cause, and we are here on accessory after the fact in that he drove the shooter away from the scene knowingly. Of course, he

was there when gunshots went off.  He was there when -- none of his brothers or the people he brought got shot.

Your Honor, I believe there is enough for probable cause that he is an accessory after the fact to murder.  We are still working on identifying for sure who the shooter was.  And, of course, with these additional names provided at the preliminary hearing for the first time today, we can continue on in that investigation.

**THE COURT:**  Thank you very much.  This is obviously a serious case.  Any taking of human life is serious and a grave offense.  And young people in college in the prime of their life and somebody being killed is a great tragedy.

What's before us today is probable cause to believe that Jamison Kelly committed the crime of accessory after the fact of murder.

This is an ongoing investigation, and it's clear how we got here.  We have this tragic shooting coming out of an incident

with 12, 14, 20, 7, an unknown number of people present, but it sounds like a dozen or more is likely.

The statement that did come into evidence which the Court has read, it was not read in public, indicates that Mr. Kelly was knocked to the ground, and while he was on the ground, there were several gunshots.  This witness said four. This is Exhibit 1.

The statement is *I was afraid for Jamison's life and kept my eyes on him. And while I was being hit and pushed around by Alpha's, I then heard gunshots from behind me and saw Jamison on the ground, and everybody began running.  I ran to Jamison screaming and shook him.  He asked me where the shots came from, and I told him from behind me.  We asked each other if we were okay.  Then we both went our separate ways, and I left campus.*

So the state of the evidence is that a witness said that Mr. Kelly came to the campus with three others, that one of those three picked up a gun.  That after a

shooting, Kelly and those three others, including the one who picked up the gun, left with him.

We don't have the gun.  There was some hearsay that one of the persons with Mr. Kelly was a shooter.  The evidence, though, concerning Mr. Kelly specifically is that he was on the ground when the shooting took place and then returned to his car and left with the people with whom he came.

I don't have evidence before me that Mr. Kelly knew that somebody that was with him picked up a gun or that somebody that was with him fired the gun or that the person that was with him, if that person fired the gun, is the one who hit Mr. Burns.  The dots have not been connected to establish probable cause that Mr. Kelly committed the crime of the accessory after the fact to murder.

The investigation is ongoing and is continuing, but because the probable cause at this stage fails to meet that minimum standard, then Mr. Kelly will be

discharged. That does not mean that he cannot be -- that the investigation will not continue and that he might later be charged or that he might later be indicted.

He cannot be continued to be held with this crime on the minimal evidence presently before the Court, so he will be discharged today. That will be the judgment of the Court.


* * * HEARING CONCLUDED * * *

## COURT REPORTER'S CERTIFICATE

**STATE OF MISSISSIPPI**

**COUNTY OF HINDS**

I, Pearlie Westmoreland, Official Court Reporter for Hinds County Court, do hereby certify that the foregoing pages constitute a true and correct transcript of the proceedings had in this entitled and numbered cause before the **Honorable James Bell, Hinds County Judge,** on the 13th day of November 2023.

I do further certify that my certificate annexed hereto applies only to the original and certified transcript.  The undersigned assumes no responsibility for the accuracy of any reproduced copies not made under my control or direction.

Witness my signature, this the 10th day of December 2024.

                              _____
                              **PEARLIE WESTMORELAND**
                              **Official Court Reporter**

CSR NO. 1134

_____